# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

**GERALDINE M. WINFIELD,**

        **Plaintiff,**                       **Case No. 2:09-cv-244**
                                              **JUDGE GREGORY L. FROST**
      **v.**                                 **Magistrate Judge Norah McCann King**

**ROBERT M. GATES, Secretary**
**Department of Defense, et al.,**

        **Defendants.**

## OPINION AND ORDER

This matter is before the Court for consideration of a motion for summary judgment (Doc. # 39) filed by Defendant Robert M. Gates, the Secretary of Defense, a memorandum in opposition (Doc. # 43) filed by Plaintiff, Geraldine M. Winfield, and a reply memorandum (Doc. # 44) filed by Gates.  For the reasons that follow, the Court **GRANTS** Gates's motion.  (Doc. # 39.)

## I.  Background

From about July 22, 2007 to April 18, 2009, Plaintiff, Geraldine M. Winfield, was employed as a materials handler in the Central Receiving Facility ("CRF") for Defense Logistics Agency Enterprise Support ("DES"), a component of the Defense Logistics Agency ("DLA"), at the Defense Supply Center Columbus ("DSCC") in Franklin County, Ohio.  DLA is a component of the Department of Defense.  Winfield, an African-American female, asserts that during her employment at CRF she was discriminated against on the basis of race and gender, subjected to a hostile work environment, and ultimately constructively discharged.

The purportedly relevant facts date back to August 2007, when Winfield notified her

1

union representative, George Parks, and a temporary supervisor, Perry Brumfield, of occurrences in which Frank Walker allegedly used profanity and engaged in threatening behavior.  Walker is an African-American male who is the Materials Handler Leader at CRF.  Additionally, Winfield notified Parks and Brumfield that Walker did not understand CRF operations.  On August 30, 2007, Walker told Winfield that she was not allowed to send e-mails or to call Brumfield without Walker's permission.  In response, Winfield sent a letter to Douglas Smith, Deputy Facility Engineer, DSCC, a Caucasian male who supervised Walker, Rawls, and Winfield.  The letter indicated that Walker was not allowing Winfield to perform her job duties.

On September 6, 2007, Winfield contacted Smith again with reports of Walker yelling at her and other employees.  On September 7, 2007, Winfield sent a letter to Smith stating that Walker was hostile, threatening, and verbally abusive to her during an incident arising from Walker's failure to inform Winfield of changes in the FedEx delivery schedule.  Walker informed Curtis Rawls, Winfield's co-worker, of the changes.  Additionally, on September 7, 2007, Walker sent an e-mail to Smith requesting that Winfield be removed from CRF.

On September 19, 2007, Walker instructed Winfield to use her personal cell phone to photograph damaged freight.  Rawls was not required to do the same.  Winfield sent an e-mail to Walker stating that she should not be required to take pictures of damaged freight with her personal cell phone.  On September 21, 2007, Walker allegedly entered a room in which Winfield was present and said to her, "Doug [Smith] is here.  Is there anything you want to bark to him about?"  (Doc. # 43-1, Winfield Aff., at ¶ 7.)  Around this time, Parks attempted to set up a mediation session between Winfield and Walker, but Walker purportedly refused to attend.

On September 27, 2007, Winfield sent an e-mail to Walker and Rawls complaining that she was being left alone on the dock to conduct work when Winfield, Walker, and Rawls were

required to share equally in the endeavor.  Walker did not respond.

On October 31, 2007, Winfield received and signed for a UPS package addressed to associate Ken Mayle from Cheryl & Co., a cookie and pastry company.  On November 1, 2007, Winfield was ordered by Walker to go to the mailroom and bring the Cheryl & Co. package to him.  Subsequently, Walker opened the package and shared the contents with CRF staff members.  As a result of this incident, Winfield sent an e-mail to Smith on January 22, 2008 requesting clarification of the policy regarding personal packages sent to associates.  Smith did not respond.

On January 28, 2008, Walker informed Winfield that her overtime was being cancelled for three days.  Winfield thereafter contacted her union representative.

On February 12, 2008, Walker told Winfield to send him a daily e-mail outlining any occurrences at CRF that occurred after Walker left for the day.  Additionally, Walker informed Winfield that she must obtain Walker's permission before contacting her first-line supervisor, James M. Flanary, Chief Operations Support, DSCC.  Flanary is a Caucasian male.  Shortly thereafter, Winfield sent an e-mail to Walker noting that she and other employees did not have access to the fax machine as a result of Walker changing the locks to his office.  Subsequently, Smith ordered Walker to remove the fax machine from the office so that all employees could have access.

On March 4, 2008, Flanary held a meeting with Walker and Winfield in which Flanary indicated that he wanted  "the bickering" to stop.  Winfield alleges that the word "bickering" was directed only at her, but Flanary denies this contention.

On March 6, 2008, Winfield requested equal distribution of the amount of time each employee had to spend working on the dock from Walker and Flanary.  No changes were made.

On March 13, 2008, Winfield informed Flanary that she was being discriminated based upon her gender and her race.

In mid-March 2008, Walker had several loud and profanity-laced arguments with UPS drivers Boris Lavric and Jack Purdy, but Walker received no disciplinary action. On March 18, 2008, Winfield informed Flanary that packages were being improperly x-rayed and that Walker was sampling large shipments of paper from Corporate Express and cleaning supplies by Jantron. Walker responded to this information by calling Winfield a "tattle tale." On the same day, Flanary sent Winfield an e-mail informing Winfield that he had made an appointment for her to meet with Kim Edens at the EAP office. Neither Walker nor Rawls were directed to the EAP office.

On March 31, 2008, Winfield was reprimanded by Newark Parcel Service for improperly handling a delivery. Walker had not asked Winfield for an explanation or her version of the events leading to the reprimand.

On April 18, 2008, Winfield reported to work on time and was ordered to deliver several items of freight that Walker had not delivered on his shift. Shortly after receiving these orders, Winfield entered Walker's office where both Walker and Flanary were working and asked if she could gather her things. Assuming that Winfield was leaving due to a disciplinary "proposal to remove" that was pending against her and which was the subject of a meeting scheduled for later that day, Flanary stated, "It is just a proposal. What do you mean gather your stuff?" Winfield responded by stating, "Well, I quit. I can't work here anymore." Flanary then said, "That's up to you." (Doc. # 32, Flanary Dep., at 76.) Shortly thereafter, Flanary formally issued the proposal to remove to Winfield. Winfield in turn tendered her formal resignation, stating, "Here's my resignation. I quit. I've already contacted Ofc. Seabrooke to scrape my detail off

my car." (Doc. # 32, Flanary Dep., at 77.) The proposal to remove asserted that Winfield had engaged in abusive and offensive behavior, made insulting and disparaging racial remarks, failed to follow procedure, and defied authority. In his deposition, Flanary described the proposal as issued in accordance with company policy and stated both that he did not intend to terminate Winfield and that no decision had been made to remove Winfield "from federal service at [that] time or in the future." (Doc. # 32, Flanary Dep., at 78.)

On June 27, 2008, Winfield filed a complaint of employment discrimination with DLA. On February 27, 2009, DLA issued a final decision, which stated that Winfield was not discriminated against as she alleged.

Winfield subsequently filed the instant action on March 31, 2009, asserting federal claims under Title VII of the Civil Rights Act of 1964 and 42 U.S.C. § 1981 against Gates, Flanary, Smith, and Walker. (Doc. # 2 ¶¶ 3-7, 75-88.) This Court granted a motion to dismiss the § 1981 claims in a November 5, 2009 Opinion and Order. (Doc. # 24.) Only Claim One, the Title VII claim against Gates, remains pending. Gates filed a motion for summary judgment. (Doc. # 39.) The parties have completed briefing on the motion, which is ripe for disposition.

## II. Discussion

### A. Standard Involved

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2). The Court may therefore grant a motion for summary judgment if the nonmoving party who has the burden of proof at trial fails to make a showing sufficient to establish the existence of an element that is essential to that party's case. *See Muncie Power Prods., Inc. v. United Tech. Auto., Inc.*,

328 F.3d 870, 873 (6th Cir. 2003) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).

In viewing the evidence, the Court must draw all reasonable inferences in favor of the nonmoving party, which must set forth specific facts showing that there is a genuine issue of material fact for trial. *Id*. (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp*., 475 U.S. 574, 587 (1986)); *Hamad v. Woodcrest Condo. Ass'n*, 328 F.3d 224, 234 (6th Cir. 2003). A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Muncie*, 328 F.3d at 873 (quoting *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986)). Consequently, the central issue is " 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.' " *Hamad*, 328 F.3d at 234-35 (quoting *Anderson*, 477 U.S. at 251-52).

### B. Analysis

As noted, the sole remaining claim left in Winfield's Complaint is the Title VII claim. Although perhaps less than artfully pled, it appears that this claim is comprised of three related, or at times partially overlapping, components: that Winfield was subjected to a hostile work environment, that she was constructively discharged, and that she was subject to race and gender discrimination.

To prove discrimination in the form of a hostile work environment, Winfield must show that

> (1) she was a member of a protected group, (2) she was subjected to unwelcome harassment, (3) the harassment was based upon the employee's protected status, such as race or gender, (4) the harassment affected a term, condition, or privilege of employment, and (5) the defendant knew or should have known about the harassing conduct but failed to take any corrective or preventive actions. *Williams v. Gen. Motors Corp.,* 187 F.3d 553, 560-61 (6th Cir. 1999) (discussing the requirements for proving a hostile work environment claim based upon

6

gender); *Moore v. KUKA Welding Sys. & Robot. Corp.,* 171 F.3d 1073, 1078-79 (6th Cir. 1999) (setting forth the elements of a prima facie case for a claim of a hostile work environment based upon race).

*Howard*, 70 F. App'x at 281 (citing *Farmer v. Cleveland Pub. Power*, 295 F.3d 593, 604-05 (6th Cir. 2002)).  The Sixth Circuit has further explained that a Title VII plaintiff must show that

> the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment . . . .  Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment–an environment that a reasonable person would find hostile or abusive–is beyond Title VII's purview.  Likewise, if the victim does not subjectively perceive the environment to be abusive, the conduct has not actually altered the conditions of the victim's employment, and there is no Title VII violation.

*Virgilio v. Potter*, 59 F. App'x 678, 681 (6th Cir. 2003) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21-23 (1993)) (internal quotes and citations omitted); *see also Howard*, 70 F. App'x at 282.

The touchstone of a hostile work environment claim is thus proof that "the workplace is permeated with 'discriminatory intimidation, ridicule, and insult,' . . . that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.' "  *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (quoting *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 65 (1986)).  There is both a subjective and an objective prong to this standard.  In other words, "the conduct must be severe or pervasive enough to create an environment that a reasonable person would find hostile or abusive, and the victim must subjectively regard that environment as abusive."  *Black v. Zaring Homes*, 104 F.3d 822, 826 (6th Cir. 1997) (citing *Harris*, 510 U.S. at 21-22).  Consequently, the question before the Court is whether a reasonable person would have found Winfield's work environment to be hostile or abusive.

7

In answering this question, the Court must consider various factors including "[t]he frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris*, 510 U.S. at 23. Although the work environment as a whole must be viewed by the Court, including all alleged acts of harassment or abuse, if such acts are irregular and sporadic rather than continuous and frequent, it is much more difficult to prove a hostile work environment claim. *See id.* This is because "not all workplace conduct that may be described as 'harassment' affects a 'term, condition, or privilege' of employment within the meaning of Title VII." *Meritor Sav. Bank, FSB*, 477 U.S. at 67. For example, "simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment.' " *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (internal citations omitted).

Necessarily construing the evidence in a light most favorable to Winfield, the Court concludes that the conduct complained of does not rise to the level of a hostile work environment. The distinct incidents about which Winfield complains are often so discrete and are so lacking in severity that they could hardly be regarded under the totality of the circumstances as permeating the workplace with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to affect Winfield as she claims to have been affected.

The Court recognizes that Winfield may have often found the manner is which she was treated or the manner in which other employees interacted with her distasteful or upsetting. Walker, for example, appears to have a management style involving a mix of profanity and alternately yelling at or otherwise ignoring employees. Although there is no question that he and Winfield did not get along, Title VII does not exist to ensure that everyone who works together

8

enjoys one another's company or personality.  Title VII is simply not a general civility code.  *See Faragher*, 524 U.S. at 788 ("These standards for judging hostility are sufficiently demanding to ensure that Title VII does not become a 'general civility code.' ").  *See also Black*, 104 F.3d at 826 ("Title VII was 'not designed to purge the workplace of vulgarity' " (quoting *Baskerville v. Culligan Int'l Co.,* 50 F.3d 428, 430 (7th Cir. 1995))).  Thus, the relatively meager instances of discourtesy or rudeness involved here cannot be confused with serious harassment or discrimination premised upon racial or other impermissible grounds.  *See Faragher*, 524 U.S. at 787.  While not excusing the treatment or behavior reflected in the evidence, the Court must nonetheless recognize that the instances of asserted impropriety do not amount to discriminatory changes in the terms and conditions of Winfield's employment.  *See id.* at 788.

Similarly, Winfield has failed to demonstrate that she was constructively discharged. The Sixth Circuit has explained that "[t]o constitute a constructive discharge, the employer must deliberately create intolerable working conditions, as perceived by a reasonable person, with the intention of forcing the employee to quit and the employee must actually quit."  *Moore v. KUKA Welding Sys. & Robot Corp.*, 171 F.3d 1073, 1080 (6th Cir. 1999).  Winfield argues that the following together constitute constructive discharge: several instances involving profane comments and threatening behavior by Walker; numerous instances throughout 2007 and 2008 where she asked for clarification, for direction, or shared concerns on issues relating to the CRF workplace environment, and was ignored; preferential treatment of her male co-workers; instances of being required to spend more time in unfavorable work environments; and consistent use of the women's restroom by male co-workers.

Although an employee can be considered constructively discharged when she reasonably believed her termination was imminent, *Ford v. Gen. Motors Corp.*, 305 F.3d 545, 554 (6th Cir.

2002), no reasonable person in Winfield's position could have believed based on the evidence before this Court that her termination was necessarily imminent at the time Winfield resigned. Perhaps even more notable, Winfield has failed to offer evidence from which a reasonable jury could conclude that there was the intent to compel Winfield to quit.

This is important because, as the Sixth Circuit has explained, courts must also examine the employer's intent in constructive discharge cases. *Moore*, 171 F.3d at 1080; *Yates v. Avco Corp.*, 819 F.2d 630, 636 (6th Cir. 1987). Such "[i]ntent can be shown by demonstrating that quitting was a foreseeable consequence of the employer's actions." *Moore*, 171 F.3d at 1080. But, as the court of appeals has emphasized, "[t]he plaintiff must show more than a Title VII violation to prove constructive discharge, so the fact that plaintiff may have proven a hostile work environment is not enough by itself to prove constructive discharge also." *Id.* As explained above, Winfield has failed even to create an issue of fact as to whether a hostile work environment existed in violation of Title VII. The evidence upon which she relies simply does not show that Gates created or permitted the circumstances of Winfield's employment with the intention of forcing her to quit.

Based on the foregoing, the Court concludes that, even when viewing all of the evidence in the light most favorable to Winfield, she has also failed to raise a genuine issue of material fact as to whether she was constructively discharged. No reasonable juror considering her evidence could conclude that a reasonable person in Winfield's position would have felt compelled to end employment because of her working conditions.

This conclusion also informs the disposition of Winfield's contentions that she was discriminated against based upon her being an African-American and upon her being a female. To establish such discrimination, Winfield is "required to either 'present direct evidence of

10

discrimination or introduce circumstantial evidence that would allow an inference of discriminatory treatment.' " *Carter v. Univ. of Toledo*, 349 F.3d 269, 272-73 (6th Cir.2004) (quoting *Johnson v. Kroger Co.*, 319 F.3d 858, 864-65 (6th Cir. 2003)).  Because Winfield has failed to present direct evidence of discrimination, she must rely on circumstantial evidence to prove discrimination.

Discrimination claims based upon circumstantial evidence are evaluated under the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), and refined in *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248 (1981). Under that familiar framework, Winfield carries the initial burden of establishing a *prima facie* case of discrimination.  *Burdine*, 450 U.S. at 252-53; *Vaughn v. Watkins Motor Lines, Inc.*, 291 F.3d 900, 906 (6th Cir. 2002).  If Winfield succeeds in proving a *prima facie* case of discrimination, a rebuttable presumption of discrimination arises, shifting the burden to Gates " 'to articulate some legitimate, nondiscriminatory reason' " for taking the challenged employment action or actions.  *Burdine*, 450 U.S. at 253 (quoting *McDonnell Douglas*, 411 U.S. at 802).  If Gates satisfies this burden, Winfield must prove that the proffered reason was actually a pretext to hide unlawful discrimination.  *Burdine*, 450 U.S. at 253 (quoting *McDonnell Douglas*, 411 U.S. at 804).

To establish a *prima facie* case of race or gender discrimination, Winfield must demonstrate (1) that she is a member of a protected class; (2) that she suffered an adverse employment action; (3) that she was qualified for the job; and (4) she was replaced by a person outside of the protected class.  *Wright v. Murray Guard, Inc.*, 455 F.3d 702, 707 (6th Cir. 2006); *Clayton v. Meijer, Inc.*, 281 F.3d 605, 610 (6th Cir. 2002).  Winfield can also make out a *prima facie* case by showing, in addition to the first three elements, that a comparable non-protected

11

person was treated better than her.  *Wright*, 455 F.3d at 707; *Clayton*, 281 F.3d at 610; *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 582-83 (6th Cir. 1992).

The parties dispute whether Winfield was subjected to an adverse employment decision and whether Winfield was treated less favorably than similarly situated members of a non-protected class.  It is well settled that "[a]n adverse employment action is a 'materially adverse change in terms or conditions of . . . employment because of [the] employer's conduct.' " *Policastro v. Nw. Airlines, Inc.*, 297 F.3d 535, 539 (6th Cir. 2002) (quoting *Kocsis v. Multi-Care Mgmt., Inc.*, 97 F.3d 876, 885 (6th Cir.1996) (alteration in original)).  Such a materially adverse change includes " 'termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation.' " *Hollins v. Atlantic Co., Inc.*, 188 F.3d 652, 662 (6th Cir. 1999) (quoting *Crady v. Liberty Nat'l Bank & Trust Co.*, 993 F.2d 132, 136 (7th Cir. 1993)).  Notably, "a change in employment conditions 'must be more disruptive than a mere inconvenience or an alteration of job responsibilities.' " *Kocsis*, 97 F.3d at 886 (quoting *Crady*, 993 F.2d at 136).  Thus, *de minimis* employment actions, such as reassignments without changes in salary, benefits, title, or work hours usually do not constitute adverse employment actions.  *Id.* at 885.

Gates reasons that he is entitled to summary judgment because Winfield has failed to show that she was subjected to any materially adverse employment action.  Winfield argues that her "resignation was a constructive discharge and as such, she suffered an adverse employment action."  (Doc. # 43, at 28.)  As noted above, Winfield can establish constructive discharge by showing that Gates "deliberately create[d] intolerable working conditions, as perceived by a reasonable person, with the intention of forcing" Winfield to quit.  *Moore*, 171 F.3d at 1080.

12

Winfield must show that her working conditions were not merely hostile, but rather " 'so difficult or unpleasant that a reasonable person in [her] shoes would have felt compelled to resign.' "  *Held v. Gulf Oil Co.*, 684 F.2d 427, 432 (6th Cir.1982) (quoting *Bourque v. Powell Elec. Mfg.*, 617 F.2d 61, 65 (5th Cir. 1980)).  *See also Wilson v. Firestone Tire & Rubber Co.*, 932 F.2d 510, 515 (6th Cir. 1991).

Winfield's arguments fail because the claims lack sufficient evidentiary support to show that Gates deliberately created intolerable conditions.  *See Moore,* 171 F.3d at 1080.  In regard to Winfield's assertion that her direct supervisor engaged in threatening behavior, the evidence indicates several occasions in which Walker became upset and used profane or otherwise distasteful language.  But as already discussed, such workplace conduct as described by Winfield is insufficient to constitute intolerable working conditions.  *See Kinamore v. EPB Elec. Util.*, 92 F. App'x 197, 205 (6th Cir. 2004) (use of profane language by supervisor held insufficient to constitute intolerable working conditions).  Similarly, the evidence that Winfield was required to spend additional time working on the unloading dock, removing trash, and making deliveries is insufficient to establish intolerable working conditions.  *See id.* (holding that an assignment to clean-up task does not constitute intolerable working conditions).

Additionally, there is no proof that CRF's actions were motivated by a discriminatory intent or with the intent to force Winfield to quit.  Winfield alleges numerous instances throughout 2007 and 2008 where she asked for clarification, direction, or shared concerns on issues relating to the CRF workplace environment and was ignored.  There is no evidence that these occurrences were motivated by a discriminatory animus, rather than simply the result of poor or less than optimally professional management.  Such poor management is insufficient to constitute intolerable working conditions.  Further, Winfield was asked to work on the dock,

13

remove trash, and make deliveries (as were other employees).  She was never demoted and never received a reduction in salary.  She was also never reassigned, was never asked to work under a different supervisor, was never subjected to a reduction in work responsibilities.  Additionally, CRF initiated the proper procedures for an investigation into the propriety of Winfield's removal.

Last, Winfield's claim must fail based on the rationale of *Hammon v. DHL Airways, Inc.*, 165 F.3d 441 (6th Cir. 1999).  In that case, the Sixth Circuit held that an employee cannot claim that she suffered an adverse employment action if she has voluntarily resigned.  *Id.* at 447.  Winfield's conduct thus constitutes an effective resignation from her employment.  *See id.* at 448-49 (describing doctrine of effective resignation).  Winfield more than once expressed an intention to resign and carried through on her expressed intent.  Although she now argues that she felt compelled to quit, this after-the-fact explanation of her conduct finds no foundation as discussed above, which undercuts her argument.  *See Baechle v. Energizer Battery Mfg., Inc.*, No. 1:09 CV 217, 2010 WL 2342473, at *12 (N.D. Ohio June 9, 2010) (noting in finding that an effective resignation defeated a discrimination claim that a court "must 'consider[] the objective manifestations of an employee's intent rather than evidence of subjective intent' in determining whether an employee has effectively resigned" (quoting *Pownall v. City of Perrysburg*, 63 F. App'x 819, 822 (6th Cir. 2003))).  Winfield "fails to evidence any facts that she was either forced to work in intolerable conditions or that it was [her employer's] intention to force resignation."  *Tooson v. Winton Woods City Sch. Dist.*, No. 1:09-cv-449, 2010 WL 1433315, at *5 (S.D. Ohio Apr. 6, 2010) (applying *Hammon* in rejecting age and gender discrimination claims).  Because she therefore cannot establish a constructive discharge and because she voluntarily terminated her own employment through effective resignation, Winfield cannot show

14

that she suffered the requisite adverse employment action.  *See Baechle*, 2010 WL 2342473, at

*14.  Nor has she directed this Court to comparable employees similar in all relevant aspects to

establish discriminatory treatment based on race or gender.

Even when viewing the evidence in the light most favorable to Winfield and drawing all

reasonable inferences in her favor, the Court must recognize that the evidence is not such that a

reasonable jury could return a verdict in Winfield's favor on her allegations of discrimination.

Accordingly, Gates is entitled to summary judgment on each component of Winfield's Title VII

claim.

### III.  Conclusion

For the foregoing reasons, the Court **GRANTS** Gates's motion for summary judgment.

(Doc. # 39.)  The Clerk shall enter judgment accordingly and terminate this case upon the docket

records of the United States District Court for the Southern District of Ohio, Eastern Division, at

Columbus.

**IT IS SO ORDERED.**

/s/Gregory L. Frost
GREGORY L. FROST
UNITED STATES DISTRICT JUDGE